IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SHANNAN K. RUTLEDGE,

       Plaintiff,

vs.                                                                               No. 99cv1474 JC/JHG

JOANNE B. BARNHART,[1]
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

       This matter is before the Court on Plaintiff's (Rutledge's) Motion to Reverse or Remand Administrative Decision, filed October 15, 2000. The Commissioner of Social Security issued a final decision denying Rutledge's application for disability insurance benefits and supplemental security income. Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Courts finds the motion to remand is not well taken and recommends that it be DENIED.

       Rutledge, now forty-eight years old, filed her application for disability insurance benefits and supplemental security income on May 9, 1995, alleging disability since March 13, 1995, due to major depression, anxiety disorder, and a seizure disorder of unknown etiology. She has a high school education, two years of college and past relevant work as a secretary, computer technician, and office manager/supervisor. On March 18, 1997, the Commissioner's Administrative Law

---

[1] On November 9, 2001, JoAnne B. Barnhart was sworn in as Commissioner of the Social Security Administration. Thus, she is substituted as Defendant in this action.

Judge (ALJ) denied benefits, finding Rutledge's impairments did not meet or equal in severity any of the disorders described in the Listing of Impairments, Subpart P, Appendix 1. Tr. 21. The ALJ reviewed Listings 1.00, 11.02, 11.03, 12.04, and 12.06 and found Rutledge did not meet the requirements of these Listings. The ALJ further found Rutledge could not return to her past work but retained the residual functional capacity (RFC) for light work of a low stress character that did not require significant interaction with the public. Tr. 35. As to her credibility, the ALJ found Rutledge was not a credible witness. *Id.* Rutledge filed a Request for Review of the decision by the Appeals Council. On October 15, 1999, the Appeals Council denied Rutledge's request for review of the ALJ's decision. Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. Rutledge seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Barker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must

discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f) and 416.920(a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson v. Sullivan*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to

the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse or remand, Rutledge makes the following arguments: (1) the ALJ failed to give proper weight to her treating physicians' opinions regarding her mental impairment; and (2) the ALJ failed to properly assess her mental impairment.

Rutledge contends the ALJ failed to give proper weight to her treating physicians' opinions regarding her depression. The ALJ was required to "evaluate every medical opinion" he received, 20 C.F.R. §§ 404.1527(d), 416.927(d), and to "consider all relevant medical evidence of record in reaching a conclusion as to disability," *Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). While "[t]he record must demonstrate that the ALJ considered all of the evidence, . . . an ALJ is not required to discuss every piece of evidence." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). However, the ALJ may not rely solely on portions of the record that support his decision and ignore evidence favorable to a claimant. *Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984).

The regulations also provide that the agency generally give more weight to medical opinions from treating sources than those from non-treating sources. 20 C.F.R. § 404.1527(d)(2). However, before the agency will give controlling weight to the medical opinion of a treating source the opinion must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2). When an ALJ decides to disregard a medical report by a claimant's physician, he must set forth "specific, legitimate reasons" for his decision. *Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996)(quoting *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987).

4

In this case, Rutledge claims "every treating physician found that [she] had a severe disabling depression." Pl.'s Mem. in Supp. of Mot. to Remand at 20. Rutledge further contends "[e]very treating source who commented on claimant's ability to work, including the two agency consulting physicians, Dr. Hutchinson and Dr. Britton, stated that [she] was unable to work." *Id.* The record indicates as follows:

On April 3, 1995, less than one month after Rutledge attempted suicide, she reported to Dr. Haley, her treating physician, that she was still unable to return to work due to her depression. Tr. 317. Dr. Haley examined her and noted she was "still considered quite disabled from being able to work in a functional capacity at this time due to her emotional status and major depression." Tr. 317. On May 1, 1995, Dr. Haley examined Rutledge and noted he would be seeing her every six months, but Dr. Klein would treat her for her depression and take care of the disability issue. *Id.*

On April 3, 1995, Dr. Klein noted Rutledge continued to be "quite depressed, feeling isolated, crying, feeling desolate, and not sleeping well." Tr. 335. Dr. Klein's notes indicate Rutledge would be receiving therapy from Diane Adlish. *Id.* On April 18, 1995, Dr. Klein reported Rutledge "looks awful," was having some suicidal thoughts, nightmares, and was misplacing things. Tr. 334. Dr. Klein attributed the nightmares to Serazone and considered hospitalizing Rutledge again. Id. Dr. Klein also noted she had to complete disability forms for Rutledge. *Id.* On May 4, 1995, Dr. Klein, after conferring with Denise Adlish, decided to hospitalize Rutledge. Tr. 333. At that time, Dr. Klein noted Rutledge had improved on the antidepressant but was still quite depressed and unable to work. *Id.* On May 9, 1995, Dr. Klein completed a Long Term Disability Claim for Rutledge. Tr. 326-27. In the form, Dr. Klein noted

5

that Rutledge's prognosis was "good" and "can take up to one year on appropriate meds." Tr. 327. Dr. Klein also noted she expected "fundamental changes in Rutledge's medical condition to take more than six months." *Id.* On June 7, 1995, Dr. Klein reported Rutledge had improved on Nortriptyline but was still "somewhat depressed." Tr. 332. Dr. Klein also noted Rutledge's reports had been sent to disability. *Id.* Dr. Klein noted that Rutledge was moving to Colorado where she would receive treatment for her depression from Dr. Fury. *Id.*

On June 22, 1995, Dr. Fury met with Rutledge and had a "get acquainted visit" with her. Tr. 360. Dr. Fury noted Rutledge was living with her parents. Tr. 360. On July 6, 1995, Dr. Fury noted Rutledge was having "crying jags" since decreasing her Nortriptyline. Tr. 359. Dr. Fury opted to continue the Zoloft and wait to taper the Nortriptyline. *Id.* On August 1, 1995, a mental health care provider in Dr. Fury's office refilled Rutledge's Zoloft and noted she was feeling some improvement and was continuing counseling. Tr. 358. On August 30, 1995, Rutledge went in for a follow up. *Id.* At that time, Dr. Fury noted Rutledge was looking "very well" and "doing quite well." *Id.* Rutledge reported she was "still [having] a great deal of difficulty with a large amount of people or people she has not met before but [was] doing better." *Id.* Dr. Fury noted Rutledge was very happy and smiling, her hair was clean, she was well dressed, well groomed and looked much better than in her prior visits. *Id.* Dr. Fury assessed Rutledge as suffering from severe depression which was improving on medications. *Id.* Dr. Fury recommended Rutledge continue with her medication and return in two months. *Id.* On December 5, 1995, Rutledge asked Dr. Fury to change her antidepressant due to weight gain. Tr. 355. Dr. Fury noted Rutledge "has been doing quite well and is getting A's in school and is learning to be around other people much more." *Id.* One week later, Rutledge's mother reported

6

Rutledge was "weepy" and forgot to go to her classes since decreasing the Nortriptyline. *Id.* Dr. Fury directed Rutledge to go back on her original dose of Nortriptyline. *Id.*

On November 11, 1995, Jan Phillips, Rutledge's counselor, reported Rutledge "appear[ed] to be making progress, still suffer[ed] not only from major depression, but anxiety, which [was] quite debilitating to her." Tr. 351. Ms. Phillips also reported Rutledge had been able to significantly increase her ability to face the outside world, however, she was still experiencing extreme anxiety when in situations with unfamiliar people, which left her life quite limited. *Id.* Ms. Phillips also indicated that Rutledge continued to take greater risks in dealing with the outside world but this continued to be difficult for her. *Id.* Ms. Phillips was "unable to determine whether or not Rutledge would ever completely be anxiety or stress free." *Id.*

Dr. Hutchinson, a psychiatrist, performed a consultative evaluation on September 12, 1995. Tr. 336-340. Dr. Hutchinson reported Rutledge cried throughout most of the interview and appeared severely depressed. Tr. 339. Dr. Hutchinson diagnosed Rutledge with major depression and anxiety disorder, not otherwise specified. *Id.* Dr. Hutchinson also opined it was possible there could be an organic component to her depression, secondary to multiple sclerosis. *Id.* Rutledge reported to Dr. Hutchinson that she was diagnosed with multiple sclerosis (MS) in 1990, even though she was never diagnosed with MS. Tr. 337. Dr. Hutchinson opined that at her level of depression, it was difficult for him to see how Rutledge "could be able to participate in competitive employment." Tr. 340.

Dr. Britton also performed a consultative examination on November 28, 1995. Tr. 341-43. Dr. Britton, a general practitioner, reported that from "the early moments of the examination [Rutledge] became tearful and maintained evidence of sad mood throughout the exam." Tr. 342.

7

Dr. Britton also reported Rutledge was completely oriented and showed no evidence of any thought disorder. *Id.* Dr. Britton assessed Rutledge "disabled to some degree at this time" from MS and depression. Tr. 341-42. Dr. Britton also noted Rutledge was taking "a large amount of medications for both depression and MS." Tr. 343. Finally, Dr. Britton noted that Rutledge had not complained of any particular problems with her rehabilitation training but "mentioned that she has real difficulty in handling any stress right now." Tr. 343.

Ms. Sue Hudgins, a counselor, provided counseling to Rutledge from March 21, 1997 to August 9, 1996. Tr. 380-385. Rutledge reported she was doing well in school and felt hopeful about her new career. Tr. 380. Again, Rutledge claimed she "had been tentatively diagnosed with multiple sclerosis because of seizures." Tr. 381. Rutledge reported she had begun to leave her feelings of despair behind but was concerned with her unpredictable rages and high anxiety. *Id.* Rutledge also reported she suffered with test anxiety. *Id.* On a subsequent visit, Ms. Hudgins reported Rutledge had "experienced some significant progress." Tr. 382. According to Ms. Hudgins' notes, Rutledge reported being depressed "most of the day." Tr. 382. Ms. Hudgins also noted that Rutledge was tearful during the entire session for the last few sessions. *Id.* Rutledge expressed she was concerned with her unpredictable rages, high anxiety, and her tendency to become depressed. Tr. 383. Ms. Hudgins opined it was possible MS was preventing Rutledge from getting past her difficulties because of neurological abnormalities. Tr. 384. Ms. Hudgins assigned Rutledge a GAF score of 35-45, indicating serious or major impairment in social, occupational and educational areas.[2] Tr. 355.

---

[2] The Global Assessment of Functioning, or GAF, Scale is used by clinicians to report an individual's overall level of functioning. *See American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders,* 32 (4th ed. 1994).

On August 21, 1996, Dr. Funk, a psychologist, saw Rutledge for an hour and indicated in his letter that "there [was] no test data available to assist in assessment." Tr. 399. Dr. Funk indicated Rutledge "reported a variety of stressors including a diagnoses of MS (with recent exacerbation of symptoms). Significantly, Dr. Funk, indicated "**[b]ased on Shannon's report**, it appears that she may have a chronic mood disorder with severe depression and anxiety. She is clearly suffering from situational stress and may be experiencing both physiological and psychological affective reactions to her MS." *Id.* Dr. Funk further opined, "**based on self report**, it is likely that Shannon is disabled emotionally at present by the severity and intrusiveness of her anxiety and depression." *Id.*

On September 5, 1996, Dr. Mitchell Burnbaum, a neurologist, evaluated Rutledge at Dr. Fury's request. Tr. 396-398. Dr. Burnbaum reported "there isn't anything on my examination today to suggest Multiple sclerosis . . . ." Dr. Burnbaum also commented on Rutledge's seizures. Dr. Burnbaum stated "I think it is worth mentioning that the 'complex partial seizures' are odd in that they aren't stereotyped and would vary from one episode to the next. This always brings up the possibility of a non-epileptic event." Tr. 398. Dr. Burnbaum also opined that Rutledge's tonic clonic seizures were non-epileptic events. *Id.* Dr. Burnbaum made clear that his opinions were conjecture since he did not have her records. *Id.* Dr. Burnbaum proposed reviewing the records, including the actual EEG and MRI scans, and requested Rutledge contact him within two weeks. *Id.* There is no evidence in the record that Rutledge followed up with Dr. Burnbaum.

On October 2, 1996, Dr. Whitlock, a psychiatrist, saw Rutledge. Tr. 392-94. It was Dr. Whitlock's impression that Rutledge suffered from organic affective syndrome secondary to MS

9

with depression, anxiety, panic/agoraphobia, seizure disorder secondary to MS, and marital conflict secondary to organic affective syndrome secondary to MS. Tr. 394. Dr. Whitlock recommended tapering off the Nortriptyline, increasing the Zoloft dosage, monitoring Tegretol level, and continuing treatment with her doctor. *Id.*

In his Decision, the ALJ found "none of [Rutledge's] treating sources have identified their specific opinions regarding the functional limitations stemming from Ms. Rutledge's mental disorder, save Dr. Klein." Tr. 30. The ALJ found Dr. Klein had opined Rutledge "could not perform the work she had performed at the time of her initial hospitalization in March, 1995 as an office manager of an engineering firm." *Id.* This is supported by the record. The ALJ also found "[n]evertheless, it is **apparent** Dr. Klein was not of the opinion, when stated early May, 1995, that the level of her current depression would persist past one year." *Id.*

On May 9, 1995, Dr. Klein completed a Long Term Disability Claim Physician's Statement and noted Rutledge could not return to work **at this time**, could barely care for herself, should be placed under no added stress and opined her prognosis was "good– can take up to one year on appropriate meds." Tr. 327. Dr. Klein also noted it would take more than six months for her to "expect fundamental changes" in Rutledge's medical condition. *Id.* The ALJ interpreted Dr. Klein's Physician Statement to mean Rutledge's level of depression would not persist for a "continuous period of not less than twelve months" as required by the regulations. 42 U.S.C. § 423 (d)(1)(A). Rutledge claims Dr. Klein's statements do not "equate to an opinion that she would be disabled less than one year." Pl.'s Mem. in Supp. of Mot. to Remand at 21. The Court agrees. However, the statements also do not equate to an opinion that she would be disabled for up to one year.

10

Rutledge's statement that "every treating source who commented on claimant's ability to work . . . stated that [she] was unable to work (long term)" is not supported by the record. Dr. Haley examined her and noted she was "still considered quite disabled from being able to work in a functional capacity at this time due to her emotional status and major depression." Tr. 317. Dr. Haley makes clear in his statement that Rutledge is unable to work **at this time**. Dr. Haley made this statement soon after Rutledge's suicide attempt. The Court reviewed Dr. Haley's notes and did not find any statement from him indicating Rutledge depression prevented her from working long term, i.e., for a continuous period of twelve months.

By August, Dr. Fury noted Rutledge was looking "very well" and "doing quite well." Tr. 358. At that time, Rutledge also reported she was doing better even though she was still having problems dealing with "a large amount of people." *Id.* Dr. Fury noted Rutledge was very happy, smiling, her hair was clean, she was well dressed, well groomed and looked much better than in her prior visits. *Id.* By December, Dr. Fury noted Rutledge "has been doing quite well and is getting A's in school and is learning to be around other people much more." Tr. 355. One week later, Rutledge's mother reported Rutledge was weepy since tapering her Nortriptyline. *Id.* Dr. Fury directed Rutledge to go back on her original dose of Nortriptyline. *Id.* The Court did not find a statement from Dr. Fury indicating Rutledge's level of depression rendered her unable to work long term.

Jan Phillips reported Rutledge was making progress but was still suffering from depression and anxiety. Tr. 351. Ms. Phillips also reported Rutledge had been able to significantly increase her ability to face the outside world, however, she was still experiencing extreme anxiety when in situations with unfamiliar people, which left her life quite limited. *Id.* Ms. Phillips also indicated

that Rutledge continued to take greater risks in dealing with the outside world but this continued to be difficult to her. *Id.* Ms. Phillips was "unable to determine whether or not Rutledge would ever completely be anxiety or stress free." *Id.* This statement says nothing about Rutledge's ability to return to work since no one is ever completely anxiety or stress free.

Dr. Britton noted Rutledge was disabled to **some degree at this time**. Tr. 341-42. However, he offered no opinion as to whether he considered her unable to work. Dr. Hutchinson opined that at her level of depression, it was difficult for him to see how Rutledge "could be able to participate in competitive employment." Tr. 340. The ALJ does not mention Dr. Hutchinson's report. However, Dr. Hutchinson stated it was possible there could be an organic component to her depression secondary to the MS.

Ms. Hudgins reported Rutledge had "experienced some significant progress," was doing well in school, felt hopeful about her new career, and had begun to leave her feelings of despair behind. Tr. 380-81. Ms. Hudgins also noted that Rutledge was tearful during the entire session for the last few sessions. *Id.* Ms. Hudgins opined it was possible MS was preventing Rutledge from getting past her difficulties because of neurological abnormalities. Tr. 384. Ms. Hudgins offered no opinion regarding whether the degree of Rutledge's depression prevented her from working.

Although Dr. Funk opined Rutledge was "likely disabled emotionally due to the severity and intrusiveness of her anxiety and depression," he made clear in his report that his opinion was based on Rutledge's report of her condition.

Dr. Whitlock and Dr. Burnbaum also did not opine as to whether Rutledge was unable to work. However, Dr. Burnbaum seriously questioned whether Rutledge in fact had MS. This is

significant because emotional lability is common in MS. See *The Merck Manual* 1474 (17 ed. 1999). Apathy, lack of judgment, or inattention may also occur. *Id.* Although convulsive seizures may occur, this happens infrequently. *Id.* Rutledge informed some physicians that she suffered from MS. This had to affect the evaluations and opinions by the physicians that believed Rutledge suffered from MS.

In his Decision, the ALJ discussed every medical opinion except Dr. Hutchinson's opinion. The ALJ specifically rejected Dr. Funk's opinion and set forth his reasons for doing so. The ALJ also questioned Dr. Whitelock's evaluation and assessment because although Rutledge informed him that her MS diagnosis had been seriously questioned, nonetheless, he still diagnosed her with "organic affective syndrome secondary to MS with depression." Tr. 30. The ALJ made clear in this Decision that he was "persuaded Ms. Rutledge ha[d] never received a diagnosis of multiple sclerosis." Tr. 33. As a neurologist, Dr. Burnbaum's opinion regarding Rutledge's MS diagnosis was entitled to more weight than Dr. Whitelock's opinion. See 20 C.F.R. § 404.1527(d)(5). In light of Dr. Burnbaum's findings and opinion, it was reasonable for the ALJ to question the validity of any medical opinion that relied on the MS diagnosis for his or her opinion. Although the ALJ failed to discuss Dr. Hutchinson's evaluation, Dr. Hutchinson accepted Rutledge's MS diagnosis and based his opinion on this.

In assessing the severity of Rutledge's mental impairment, the ALJ also considered Rutledge's ability to attend school and her exceptional performance in the most difficult course offered at the vocational-technical school she attended. The ALJ considered the fact that "within five months of onset, she was able to attend classes . . . on a daily basis from 8:00 to 2:45 in classes of 10 people." Tr. 31. The ALJ found Rutledge's performance in school contradicted her

claim that she was precluded from working because she could not concentrate and her memory was impaired. Tr. 34. Specifically, the ALJ found her ability to excel in her electronic technician program provided "significant evidence of her mental abilities despite the presence of her depression and severity." Under *Markham v. Califano*, 601 F.2d 533 (10th Cir. 1979) and *Gay v. Sullivan*, 986 F.2d 1336 (10th Cir. 1993), this was proper. Both cases stand for the proposition that, while not conclusive, "such activities [as school attendance] may be considered by the Secretary, along with medical testimony, in determining the right of a claimant to disability payments under the [Social Security] Act." *Gay*, 986 F.2d at 1339 (citing *Markham*, 601 F.2d. at 534).

The ALJ also considered Rutledge's activities of daily living and concluded that her reported activities belied her allegation that she had significant problems with her depression and anxiety, particularly when in unfamiliar places and in the presence of unfamiliar people. Tr. 31. Besides her school activities, the ALJ considered that Rutledge had remarried and was now maintaining a household, reported she gardened, baked, shopped, and went fishing once a month. *Id.* Rutledge also reported she played golf with her husband on an occasional basis. Tr. 32. The ALJ also considered her allegation that she suffered from "periods of uncontrollable rage and crying jags that last[ed] for 15 minutes or more." *Id.* Because there was no evidence that these episodes of rage and crying occurred in her classroom, the ALJ was "unpersuaded that these events occurred with the intensity she described." *Id.* The ALJ further found Rutledge's seizure disorder and her mental impairments were nonexertional impairments that eroded her RFC for light work. Tr. 35. Therefore, the ALJ found she could perform work "provided it was of a low stress character and did not involve work with the public." *Id.* In his hypothetical to the

14

vocational expert (VE), the ALJ considered Rutledge's inability to deal with the public and her difficulty handling a high stress environment. Tr. 34. The VE opined Rutledge was able to perform the occupations of surveillance monitor, highway flagger, and clerical work which did not involve interaction with the public or a large group of co-workers. Tr. 36, 37. Based on the record as a whole, the Court finds that the ALJ gave the proper weight required by the regulations to her treating physicians' opinions and properly assessed her mental impairment. Substantial evidence supports the ALJ's finding that Rutledge's mental impairment, although present, is not disabling to a degree that it would preclude all work.

## RECOMMENDED DISPOSITION

The ALJ applied correct legal standards and his decision is supported by substantial evidence. Rutledge's Motion to Reverse or Remand Administrative Decision, filed October 15, 2000, should be denied and this case dismissed.

JOE H. GALVAN
UNITED STATES MAGISTRATE JUDGE

**<u>NOTICE</u>**

Within ten days after a party is served with a copy of these proposed findings and recommended disposition that party may, pursuant to 28 U.S.C. § 636 (b)(1), file written objections to such proposed findings and recommended disposition. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.